## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DEBORAH A. BLANKENSHIP,               )
                                       )
      Plaintiff,                        )
                                       )
    v.                                 )      Civil Action No. 15-318-SLR-SRF
                                       )
CAROLYN W. COLVIN,                     )
Commissioner of Social Security,       )
                                       )
      Defendant.                        )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Plaintiff Deborah A. Blankenship ("Blankenship" or "plaintiff") filed this action against defendant Carolyn W. Colvin, Commissioner of the Social Security Administration (the "Commissioner" or "defendant") on April 17, 2015. (D.I. 2) Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a decision on April 18, 2012 by Administrative Law Judge ("ALJ") Melvin D. Benitz, denying her claims for disability benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, respectively.

Presently before the court are cross-motions for summary judgment filed by plaintiff and the Commissioner. (D.I. 12; D.I. 17) Plaintiff asks the court to enter an award of benefits or, alternatively, to remand this case for further administrative proceedings. (D.I. 13 at 32) The Commissioner requests that the court affirm the ALJ's decision. (D.I. 18 at 32) For the reasons set forth below, I recommend that the court deny plaintiff's motion for summary judgment and grant the Commissioner's cross-motion for summary judgment.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed a claim for DIB benefits on May 3, 2010, and for SSI benefits on May 12,

2010, alleging that she has been disabled since August 17, 2007 due to her neck and back pain.

(D.I. 9-5, Tr. at 155-59)  Plaintiff's claims for DIB and SSI benefits were denied on September 2,

2010.  (D.I. 9-4, Tr. at 98-103)  Plaintiff subsequently submitted a request for reconsideration,

which was denied on March 9, 2011.  (*Id.* at 110-16)  On May 5, 2011, plaintiff filed a written

request for a hearing before an ALJ.  (*Id.* at 117-18)

The ALJ held a hearing on February 7, 2012.  (*Id.* at 131-36; D.I. 9-2, Tr. at 47-91)  On

April 18, 2012, the ALJ issued a written decision denying plaintiff's claim for benefits.  (D.I. 9-

2, Tr. at 29-41)  The Appeals Council denied plaintiff's request for review on July 3, 2013,

causing the ALJ's decision to become final.  (*Id.* at 1; 14-18)  The Appeals Council granted

plaintiff's request for more time to file a civil action on March 19, 2015.  (*Id.* at 1)  Plaintiff filed

the present action on April 17, 2015.  (D.I. 2)

### B.    Medical History

Plaintiff, born in 1958, was forty-eight years old at her alleged onset date.  (D.I. 9-6, Tr.

at 175)  Plaintiff is considered a person closely approaching advanced age under 20 C.F.R. §

404.1563(d).  She has a high school education and past relevant work experience as a hotel front

desk clerk and a property manager.  (D.I. 9-6, Tr. at 167)  Plaintiff alleges disability due to a

neck injury, degenerative disc disease, and nerve damage in her left arm.  (*Id.* at 165)

Plaintiff has been a patient at Total Care Physicians since 2004.  (D.I. 9-7, Tr. at 243-56)

On November 26, 2007, plaintiff visited the office complaining of vomiting and abdominal pain

that had lasted four days.  (*Id.* at 254)  She was prescribed Phenergan for her gastrointestinal

symptoms and Ambien for her insomnia. (*Id.*) On August 27, 2008, she returned to Total Care

Physicians complaining of pain on her left side like a tooth ache. (*Id.* at 255) She was diagnosed

with a thoracic strain and was prescribed Vicodin for pain. (*Id.*) She returned on November 7,

2008, complaining of neck spasms after attempting to move a couch. (*Id.* at 256) She was

diagnosed with cervical spasms and was advised to treat the pain with ice, heat, Vicodin, and

Flexeril. (*Id.*)

In 2008 and 2009, plaintiff was under the care of Dr. Seth L. Ivins, M.D., a primary care

physician. (*Id.* at 257-65) On December 30, 2008, plaintiff saw Dr. Ivins for pain in her left side

and insomnia, and she requested Zantac. (*Id.* at 265) Dr. Ivins noted her lower back pain and

neck pain, and prescribed Cymbalta. (*Id.*) Plaintiff returned on February 6, 2009, requesting

prescription refills and complaining of neck, shoulder, and left arm pain. (*Id.* at 264) Dr. Ivins

diagnosed her with cervical radiculopathy, ordered an MRI of her cervical spine, and prescribed

Lyrica for her pain. (*Id.*) On March 13, 2009, plaintiff visited Dr. Ivins again, who

recommended that plaintiff undergo an MRI of her lumbar spine and instructed her to continue

with her prescriptions. (*Id.* at 263)

On April 8, 2009, plaintiff underwent an MRI of her cervical spine, which revealed a

moderate disc bulge with central disc herniation at C5-C6, with compression of the adjacent

cervical spinal cord, mild left paracentral disc herniation abutting the adjacent cervical spinal

cord, and a mild disc bulge at C4-C5. (*Id.* at 273) On April 15, 2009, plaintiff underwent an

MRI of her lumbar spine, which revealed no abnormalities. (*Id.* at 272) On April 23, 2009, Dr.

Ivins reviewed plaintiff's test results and increased her dosage of Lyrica. (*Id.* at 261) Plaintiff

returned to Dr. Ivins on July 31, 2009 for neck and left arm pain. (*Id.* at 259) Dr. Ivins

3

recommended that plaintiff undergo physical therapy and visit a chiropractor, and continued her Lyrica and Ambien prescriptions. (*Id.*)

Plaintiff was admitted to the emergency room on September 11, 2009 after overdosing on barbiturates and cocaine, which caused her to be involved in a car accident. (*Id.* at 267) While in the hospital, plaintiff underwent a CT scan of her cervical spine, which revealed no acute cervical vertebral fracture, but showed scoliosis of the cervical spine with convexity to the right, moderate narrowing of the thecal sac at C4-C5, and bone spurs at C4-C5, C5-C6, and C6-C7. (*Id.* at 270)

Dr. Matthew Jacobson, a physician at Total Care Physicians, ordered a CT scan of plaintiff's abdomen and pelvis on July 29, 2010 due to the pain she experienced in her abdomen. (D.I. 9-8, Tr. at 309) Dr. Jacobson referred plaintiff to a gastrointestinal specialist and recommended a colonoscopy and possible upper endoscopy. (*Id.* at 311) He indicated that the abdominal CT scan was normal, and prescribed Vicodin with close monitoring due to her prior abuse of pain medication. (*Id.*)

On August 23, 2010, plaintiff was examined by state agency medical consultant Irene C. Szeto, M.D. (D.I. 9-7, Tr. at 277-80) Dr. Szeto noted a mild spasm in plaintiff's left shoulder and upper left back down to the level of the scapula. (*Id.* at 279) Plaintiff's range of motion in her left shoulder and arm was limited. (*Id.*)

On September 1, 2010, state agency medical consultant Michael H. Borek, M.D. completed a residual functional capacity ("RFC") assessment of plaintiff, concluding that plaintiff suffered from cervical spine disc disease with radiculopathy in her left upper extremity, decreased cervical range of motion, decreased grip, atrophy in her left hand, and decreased left shoulder range of motion. (*Id.* at 289) Dr. Borek concluded that plaintiff's alleged inability to

4

perform any physical activity was only partially credible because the exam findings revealed that her chief dysfunction was associated with the left upper extremity from cervical radiculopathy, and recommended a maximum RFC of light work, with occasional pushing, pulling, reaching, lifting, carrying, and fine and gross manipulation with the left upper extremity. (*Id.*)

On April 28, 2011, plaintiff visited Dr. Jacobson for left side pain near her ribs. (D.I. 9-8, Tr. at 339) She was diagnosed with cervical disc displacement and advised to follow up with a chiropractor. (*Id.* at 340) Dr. Jacobson was not able to determine the etiology of her abdominal pain, and recommended repeating the CT scan of her abdomen and pelvis to determine the cause. (*Id.*)

Plaintiff underwent an upper endoscopy in connection with her chronic abdominal pain on July 28, 2011, which revealed no abnormalities. (D.I. 9-7, Tr. at 300) On August 1, 2011, plaintiff treated with Dr. Jacobson, who noted that plaintiff's test results were normal and referred her to a gynecologist to determine whether her pain was caused by endometriosis. (*Id.* at 314-15) On August 4, 2011, plaintiff was seen by Dr. Chantel Imran, M.D., a gynecologist, who noted that plaintiff's discomfort was inconsistent and recommended that plaintiff undergo a pelvic ultrasound. (*Id.* at 301) Plaintiff had the pelvic ultrasound on August 18, 2011, which showed no abnormalities that would cause her pain. (*Id.* at 302) Dr. Imran noted that plaintiff had contacted the office several times requesting prescriptions for pain medication. (*Id.*)

On September 7, 2011, plaintiff visited Dr. Jacobson for pain in her left upper extremity, which she manages with Percocet and ice. (*Id.* at 320) Dr. Jacobson indicated that plaintiff's neck pain is controlled with visits to the chiropractor. (*Id.*) He noted that plaintiff had slight weakness on the left side of the neck as opposed to the right side and advised her to take

Percocet until an appointment with a pain management specialist for a second opinion, indicating he would not prescribe any more pain medications. (*Id.* at 321)

On September 17, 2011, plaintiff underwent an MRI of her cervical spine. (*Id.* at 303) Plaintiff's MRI results from September 17, 2011 revealed bilateral foraminal stenosis at the C5-C6 and C6-C7 levels and a small, central disc herniation with bulging at the C4-C5 level. (*Id.* at 296; 303; 306) Dr. Bikash Bose, M.D., a neurosurgeon, advised plaintiff to get an EMG of her left upper extremity, a CT scan of her cervical spine, and a bone scan with SPECT imaging of the cervical spine. (*Id.*)

On September 24, 2011, plaintiff visited Dr. Jacobson for abdominal pain and bloating caused by chronic opiate use, and Dr. Jacobson ordered an x-ray of her abdomen. (*Id.* at 324-25) On October 14, 2011, plaintiff saw Dr. Jacobson because her left side pain was not improving even though her test results came back normal. (*Id.* at 328) Dr. Jacobson recommended more CT scans to determine whether the pain arose from a nodule in her lung, or an exploratory laparoscopic surgery to rule out adhesions or endometriosis. (*Id.* at 329-30) He recommended that plaintiff follow up with another doctor to determine whether a nerve block might help with the pain. (*Id.* at 330)

On October 27, 2011, plaintiff visited Dr. Mark E. Borowsky, M.D., a gynecologic oncologist, for his opinion regarding management of plaintiff's pelvic pain. (D.I. 9-9, Tr. at 370) Dr. Borowsky reported that diagnostics revealed high grade squamous intraepitheliel lesion ("HGSIL"), high grade squamous dysplasia, and human papillomavirus ("HPV"). (*Id.* at 375) Plaintiff consented to undergo an exploratory laparoscopic surgery to determine the cause of her pain. (*Id.*)

On November 2, 2011, plaintiff visited Dr. Jacobson for continued stomach pain and weight loss. (D.I. 9-8, Tr. at 332) Dr. Jacobson noted that plaintiff had seen a specialist for pain management, but the encounter did not go well because the specialist denied her request for narcotics due to her previous drug abuse. (*Id.*) Dr. Jacobson prescribed a Fentanyl patch and Dilaudid for the pain. (*Id.* at 334) On November 12, 2011, plaintiff returned to Dr. Jacobson because the Fentanyl patch did not work and the Dilaudid did not significantly reduce her pain. (*Id.* at 335) Dr. Jacobson informed plaintiff that the existing prescriptions were all he could provide until her surgery on November 21, 2011. (*Id.* at 337) Plaintiff underwent a hysterectomy and exploratory laparoscopic surgery on November 21, 2011, during which Dr. Borowsky performed lysis of adhesions to remove scar tissue from her intestines. (*Id.* at 381) On December 1, 2011, plaintiff followed up with Dr. Borowsky, who noted that the pathology showed no residual dysplasia of the cervix. (*Id.* at 383-88)

On December 19, 2011, plaintiff visited Dr. Jacobson, continuing to complain of left side pain and requesting refills of her medications. (*Id.* at 344) Plaintiff indicated that she had been taking the maximum dosage of Dilaudid for pain, but it still did not take the edge off the pain. (*Id.*) Dr. Jacobson recommended that plaintiff receive pain management in the form of a nerve block, stimulator, or other method, and he refilled her Fentanyl and Dilaudid prescriptions. (*Id.* at 346)

On December 29, 2011, plaintiff visited Dr. Bose, who observed that plaintiff's facial sensations were decreased on the left side and her cervical range of motion was mildly restricted in lateral rotation and extension, with moderate tenderness of the mid and lower cervical spine. (*Id.* at 295) On January 4, 2012, plaintiff followed up with Dr. Borowsky, indicating that she still experienced the pain she suffered prior to surgery. (*Id.* at 394) Dr. Borowsky noted that

plaintiff was well-healed following her surgery, and recommended yearly follow-ups and continued consultation with a pain management specialist. (*Id.* at 398)

On January 17, 2012, plaintiff underwent radiographs of her cervical spine, which revealed mild narrowing of the C5-C6 and C6-C7 intervertebral disc spaces and limited mobility. (*Id.* at 399) On the same date, plaintiff underwent a CT scan of her cervical spine, which revealed a small protrusion on the left side at C4-C5 and C6-C7, as well as a disc osteophyte complex to the left side at C5-C6. (*Id.* at 400) Plaintiff's radionuclide bone scan revealed mild cervicothoracic curve convex to the left and no abnormal tracer uptake in the vertebrae and posterior arches of the cervical, thoracic, and lumbosacral spine. (*Id.* at 402) Plaintiff followed up with Dr. Bose on January 23, 2012. (*Id.* at 403) Dr. Bose reviewed plaintiff's test results and recommended anterior cervical discectomy and fusion ("ACDF") surgery on her C4-C5, C5-C6, and C6-C7 vertebrae. (*Id.*)

On January 30, 2012, Dr. Jacobson completed a medical statement regarding plaintiff's cervical spine condition. (*Id.* at 404-06) Dr. Jacobson opined that plaintiff could lift five to ten pounds with her left arm, and no weight with her right arm. (*Id.* at 405) He indicated that plaintiff had reduced mobility in her left arm and suffered severe to extreme pain. (*Id.*) Dr. Jacobson opined that plaintiff could stand and sit for thirty minutes at a time, and could work one or two hours per day. (*Id.*) He noted that plaintiff was considering surgery for a C4-C6 fusion and sought evaluation from pain management specialists. (*Id.*) Dr. Bose completed a similar evaluation regarding plaintiff's neck pain, indicating that plaintiff suffered from severe pain and limited her standing to fifteen minutes, and her sitting to one hour at a time. (*Id.* at 407) He opined that plaintiff could work four hours and lift five to ten pounds. (*Id.*) He explained that plaintiff would not be able to consistently work on a regular basis due to her pain. (*Id.*)

8

### C.   Administrative Hearing

#### 1.   Plaintiff's testimony

The ALJ held an administrative hearing on February 7, 2012. (D.I. 9-2, Tr. at 47-91) Plaintiff appeared, represented by counsel. (*Id.* at 49) Plaintiff was born on September 4, 1958, and was fifty-three years old at the time of the hearing. (*Id.* at 53) Plaintiff lives by herself. (*Id.* at 54) She is able to drive, but does not drive often because it causes her severe pain and she has difficulty turning her neck. (*Id.*)

Plaintiff has not worked since 2009. (*Id.* at 56) In 2009, plaintiff worked for several months as a front desk clerk at a hotel. (*Id.* at 55) In this position, plaintiff handled guest check-in and check-out, maintained the hotel lobby, and occasionally folded laundry. (*Id.*) Plaintiff previously worked as a property manager for various companies. (*Id.*) In these positions, plaintiff was responsible for leasing, inspections of apartments and grounds, and scheduling vendors. (*Id.* at 55-56)

Plaintiff testified that her cervical disc disease limits her ability to move her neck, and she has very little motor control in her left arm, causing her to drop things. (*Id.* at 57) Plaintiff constantly experiences sharp, shooting pains that radiate down the left side of her neck, through her shoulder and hand, causing numbness and tingling. (*Id.* at 57-58) On a scale of one to ten, she rates her pain between a six and seven during the day without medication, and between three and four when she first wakes up. (*Id.* at 58-59) By the end of the day, she rates her pain at an eight with medication, and predicts she would have to go to the hospital if she did not take her pain medication. (*Id.* at 59) Dr. Bose has recommended that plaintiff undergo surgery. (*Id.* at 60)

Plaintiff also experiences constant pain on her left side, which began in July 2011. (*Id.*) Plaintiff visited the emergency room three times since the pain began. (*Id.*) She has undergone a series of tests and a complicated hysterectomy, but the source of the pain has not yet been determined. (*Id.* at 61) The pain medication she takes for her neck pain reduces her left side pain to a four on a scale of one to ten. (*Id.* at 62)

Plaintiff testified that she wakes up three to four times per night due to the pain. (*Id.*) She takes sleep medication, but still manages to get only three or four hours of sleep at night on average. (*Id.*) She has difficulty with concentration and memory as a result of her pain. (*Id.* at 62-63) Plaintiff wears Fentanyl patches and takes Dilaudid for her pain, she takes Flexeril as a muscle relaxer, and takes Trazadone for sleep medication. (*Id.* at 64) The medications cause her to experience light-headedness, drowsiness, and loss of appetite. (*Id.*) She is not supposed to drive while taking her medications. (*Id.*)

Plaintiff is able to walk approximately fifty feet before she needs to sit due to pain and light-headedness. (*Id.* at 65-66) She testified that she is able to stand for about five to six minutes at a time before she experiences pain in her spine. (*Id.* at 66-67) She cannot bend at the waist or lift or reach with her left hand. (*Id.* at 67-69) She can sit for ten to fifteen minutes before needing to change positions. (*Id.*)

Plaintiff can read short passages on her telephone during the day. (*Id.* at 71-72) Plaintiff's daughter helps her with chores, including vacuuming, dusting, and laundry. (*Id.* at 71-72) Plaintiff testified that she can wash small dishes like a cereal bowl, but she mostly uses paper products. (*Id.* at 72) She does not go to church or participate in social groups. (*Id.*) She does not have hobbies or go out to dinner and the movies. (*Id.* at 73) She does not perform any

10

yard work or gardening.  (*Id.*)  Plaintiff testified that her daughter comes over to do her hair and paint her nails.  (*Id.* at 74)

Plaintiff indicated that she injured her back and neck in 1988 when she fell at work.  (*Id.* at 76)  At that time, she underwent physical therapy and chiropractic care, and resumed working in 1991 as a property manager.  (*Id.* at 76-77)

### 2.    Vocational expert's testimony

At the hearing, the VE testified that plaintiff had worked as a front desk clerk, which is a light exertional level position with an SVP level of four.[1]  (*Id.* at 80)  The VE noted that plaintiff also worked as a leasing agent, which is a light duty job with an SVP level of five.  (*Id.*)  The VE stated that plaintiff would have transferable clerical skills from plaintiff's prior work which would transfer to positions at both the sedentary and light exertional levels, with SVPs of three and four.  (*Id.* at 81)

The ALJ posed the following hypothetical to the VE:

I'd like for you to assume a person who is 48 years of age; has a 12th grade education; past relevant work as indicated; right-handed by nature; suffering from degenerative disc disease, mostly at the cervical area; and causes her to have pain and discomfort and her neck in her left upper extremity, with some back spasms per the record; all of which are somewhat relieved by her medications without significant side-effects; but she indicates in her testimony she gets light-headed and drowsy from all or a combination.  If I find that she needs to have jobs that are SVP 3 or 4 in nature, 2, 3, or 4, due to her pain; and if I find that she can stand for 30 minutes; sit for 30 minutes consistently on an alternate basis, however, five days a week, eight hours a day; but would need to avoid heights and hazardous machinery; temperature and humidity extremes; and what I'm kind of looking for at this time, Ms. Cody, is jobs that can be performed with the use of one arm; that is normal and painless; and minimalist—assist with the other arm; with no prolonged climbing, balancing, and stopping, stair climbing, or ropes, ladders; no

---

[1] The Dictionary of Occupational Titles (DOT) lists a specific vocational preparation ("SVP") time for each described occupation. *See* SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*  Semi-skilled work corresponds to an SVP of 3-4.  *Id.*  Skilled work corresponds to an SVP of 5-9.  *Id.*

fine dexterity with that left upper extremity, of course, or overhead reaching, or repetitive neck turning jobs due to her condition at this time; and if I find she can lift 10 pounds frequently; less or – 10 pounds frequently, 20 on occasion; and would be able to do some light work activities with those limitations. Can you give me jobs such a person could do in significant numbers?

(*Id.* at 81-82) The VE responded:

Okay, positions that would be based upon the clerical transferable skills would include that of a reception clerk, with a DOT of 237.367-010. That is at the sedentary exertional level with an SVP of 3. Regional numbers are 1,650. National numbers: 412,500. Also, based on transferable skills would be a position as a bill sorter with a DOT of 209.687-022. That is at the sedentary exertional level with an SVP of 3. Regional numbers are 790. National number is 205,400. At the light exertional level, positions which would be unskilled in order to allow for direct entry would include those of a routing clerk with a DOT of 222.587-038. That position has an SVP of 2. Regional numbers are 2,600. National number is 510,700. Also at the light exertional level, a position as an inspector with a DOT of 727.687-062. That position has an SVP of 2. Regional numbers are 2,400. National number is 384,200. Also at the light exertional level, a position as a control worker with a DOT of 649.687-010. That position has an SVP of 2. Regional numbers are 1,850. National number is 271,500.

(*Id.* at 82-83) The VE testified that plaintiff would not be able to do any of her past work with the limitations set forth in the RFC assessment. (*Id.* at 84)

On cross-examination, plaintiff's attorney asked whether a hypothetical individual who "was limited with the left upper extremity where everything was at an occasional basis for, you know, reaching in all directions, handling, fingering, push, pull . . . and, also, related to the fine and gross with the left upper extremity, how that would impact the jobs that you cited." (*Id.* at 85) The VE stated that a hypothetical individual with such limitations would be able to perform the reception clerk position and the bill sorter position at the sedentary level, and would be able to perform the routing clerk position at the light exertional level. (*Id.*)

Plaintiff's attorney then showed the VE Dr. Jacobson's opinion and asked whether a hypothetical person with the limitations expressed in that opinion would be able to perform any work. (*Id.* at 88) The VE testified that the severity of the pain would reduce the individual's

12

productivity by fifteen to twenty percent or more, which would be work preclusive. (*Id.*) The

VE additionally found that the limitations of one to two hours of work per day, and lifting only

zero to five pounds, would be work preclusive. (*Id.* at 88-89) The VE indicated that, for

unskilled positions, regular absences of even one day per month for three to four months in a row

would be work preclusive. (*Id.* at 89)

### D.    ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VE, the ALJ

determined that plaintiff was not disabled during the relevant time. (Tr. at 32) The ALJ's

findings are summarized as follows:[2]

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.

2. The claimant has not engaged in substantial gainful activity since August 17, 2007, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: cervical degenerative disc disease (20 C.F.R. § 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except the claimant can lift 20 pounds occasionally and 10 pounds frequently. The claimant needs jobs that are svp 2, svp 3 or svp 4 in nature, due to restrictions from pain. The claimant can stand for 30 minutes, and sit for 30 minutes, consistently on an alternate basis, for 8 hours a day, 5 days a week. The claimant should avoid heights, hazardous machinery, temperature and humidity extremes. The claimant can perform jobs that can be performed with the use of one normal and painless arm, with minimal assistance from

---

[2] The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

the other arm. She can do no prolonged climbing, balancing or stooping, stair climbing or ropes, ladders. The claimant can perform jobs that do not require fine dexterity or overhead reaching with the left upper extremity. Jobs that would require repetitive neck turning are precluded.

6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7. The claimant was born on September 4, 1958 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9. The claimant has acquired work skills from past relevant work (20 C.F.R. §§ 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 C.F.R. §§ 404.1569, 404.1569(a), 404.1568(d), 416.969, 416.969(a), and 416.968(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 17, 2007, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(Tr. at 34-40)

## III.   STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if

they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial

review of the ALJ's decision is limited to determining whether "substantial evidence" supports

the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making

this determination, a reviewing court may not undertake a de novo review of the ALJ's decision

and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court

14

would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints

of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the

16

claimant has the residual functional capacity[3] to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2), (3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. § 404.1527(c)(2).

### B.   Whether the ALJ's Decision is Supported by Substantial Evidence

On April 18, 2012, the ALJ found that plaintiff was not under a disability within the meaning of the Act during the relevant time period from the alleged onset date of August 17, 2007, to the date last insured on September 30, 2014. (D.I. 9-2, Tr. at 32-41) The ALJ concluded that, despite plaintiff's severe impairment of cervical degenerative disc disease, she had the residual functional capacity ("RFC") to perform light work with certain restrictions. (*Id.*)

Plaintiff contends that: (1) the ALJ erred in failing to consider plaintiff's severe left-sided

---

[3] A claimant's residual functional capacity ("RFC") is "that which an individual is able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001).

flank pain; (2) the ALJ erred in failing to accord adequate weight to the opinions of plaintiff's

treating physicians; (3) the ALJ erred because substantial evidence did not support an RFC of

light work; and (4) the ALJ failed to sustain his burden of establishing that there was other work

in the national economy that plaintiff could perform.  (D.I. 13 at 16-31)

### 1.  Severity findings

Plaintiff contends that the ALJ only addressed her cervical degenerative disc disease, and

improperly ignored evidence of plaintiff's left quadrant flank pain in his severity findings.  (D.I.

13 at 16-17)  According to plaintiff, the ALJ ignored records from Dr. Jacobson, Dr. Imran, and

Dr. Borowsky addressing plaintiff's left side pain, and the ALJ's failure to incorporate

limitations from this impairment in the hypothetical question was in error.  (*Id.* at 19)  In

response, the Commissioner alleges that plaintiff's left flank pain did not significantly limit her

ability to perform basic work activities, the objective medical findings pertaining to the condition

were mild, and the ALJ accounted for plaintiff's complaints of pain in the RFC.  (D.I. 18 at 17-

18)

The court concludes that the ALJ properly considered the evidence regarding plaintiff's

complaints of left flank pain.  Specifically, the ALJ described plaintiff's emergency room visits,

negative test results, surgery, and repeated efforts to obtain more narcotic pain medication in

connection with her doctors' efforts to diagnose and treat the pain.  (D.I. 9-2, Tr. at 36-37)

The medical records considered by the ALJ reflect that plaintiff complained of

intermittent left upper quadrant and flank pain during her April 28, 2011 visit with Dr. Jacobson,

who noted that her CT scans revealed no cause of the pain and the pain was controlled with pain

medications.  (D.I. 9-8, Tr. at 339)  Dr. Jacobson's notes reveal that plaintiff was caring for her

sister at this time, and experienced lumbar pain when bending over to trim her sister's nails and

when moving her onto a gurney. (*Id.*) In June 2011, plaintiff returned to Dr. Jacobson complaining of continuing daily left lower quadrant pain made worse with exertion and talking, and representing that she could no longer perform her daily chores. (*Id.* at 310) Dr. Jacobson observed that the CT scan of plaintiff's abdomen and pelvis were normal. (*Id.*) She continued to act as the primary care giver for her ill sister during this time, although plaintiff claimed that lifting her sister to the commode caused her abdominal side pain to flare. (*Id.*) Dr. Jacobson prescribed Vicodin and referred plaintiff to a gastroenterologist. (*Id.* at 311) In August 2011, plaintiff informed Dr. Jacobson that her abdominal pain continued, although her test results continued to be normal. (*Id.* at 314) She indicated that Percocet helped reduce her pain. (*Id.*)

The record reflects that Dr. Jacobson referred plaintiff to Dr. Imran to determine whether plaintiff's abdominal and pelvic pain could be diagnosed and treated by a gynecologist. Dr. Imran performed a cone biopsy of plaintiff's cervix in September 2011, which revealed squamous dysplasia unrelated to plaintiff's left flank pain. Dr. Imran recommended that plaintiff undergo a hysterectomy. (*Id.* at 357-58) Dr. Borowsky performed the surgery on November 21, 2011 and performed lysis of adhesions to remove scar tissue that may have been causing her pain. (D.I. 9-9, Tr. at 381) In December 2011, Dr. Jacobson indicated that plaintiff's left flank pain worsened again following the surgery, but her pain medications helped her manage the pain. (D.I. 9-8, Tr. at 344)

The record in the present matter does not demonstrate that any functional limitations arose from plaintiff's left flank pain, and the ALJ expressly concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (D.I. 9-2, Tr. at 37) At step two of the analysis, in addition to establishing a

19

diagnosis of the condition, the plaintiff must also present evidence of the limitations stemming from the diagnosis and show that plaintiff was "significantly limited her ability to do basic work activities" to establish the existence of a severe impairment. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 (3d Cir. 2007) (citing 20 C.F.R. §§ 404.1520(c), 404.1521(a); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004)).  Importantly, plaintiff does not identify specific limitations stemming from her left flank pain in the record.  Medical records in the present case reflect that plaintiff was capable of lifting her sister onto a gurney and a commode during the relevant time period, and no diagnostic tests revealed abnormalities that would cause plaintiff's pain.  Moreover, plaintiff's hysterectomy and lysis of adhesions did not improve the pain alleged by plaintiff.  Due to the ALJ's rejection of plaintiff's subjective complaints of pain, the ALJ had no obligation to incorporate any additional limitations in the RFC to account for plaintiff's left flank pain as either a severe impairment or non-severe impairment. *See Christy v. Astrue*, 2012 WL 967869, at \*4 (W.D. Pa. Mar. 21, 2012) ("The ALJ properly rejected any additional limitations as inconsistent with the objective medical evidence of record and supported only by plaintiff's subjective complaints of pain, which the ALJ found to be only partially credible."); *Musa v. Astrue*, 2008 WL 2222222, at \*6 (W.D. Pa. May 27, 2008) (concluding that the ALJ was not required to include in the hypothetical any restrictions to accommodate plaintiff's claimed pain where he found her complaints of pain to be not entirely credible).

## 2.  Weight of medical opinions and medical evidence

Plaintiff next argues that the ALJ failed to properly weigh the medical opinions of Dr. Bose and Dr. Jacobson, giving no weight to either opinion despite the consistency of the physicians' records, diagnostic testing, medical findings upon examination, and other physicians' medical records. (D.I. 13 at 24-28)  In response, the Commissioner contends that substantial

20

evidence supports the ALJ's rejection of Dr. Jacobson's opinion, which was unsupported by the medical examinations and laboratory findings, inconsistent with the record as a whole, and primarily based on plaintiff's subjective complaints. (D.I. 18 at 20-23) The Commissioner alleges that Dr. Bose's opinion was similarly unsupported by the medical record and his own treatment notes, and was based only on plaintiff's subjective complaints. (*Id.* at 23-25)

Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and is consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and is consistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). The more a treating source presents medical signs and laboratory findings to support his or her medical opinion, the more weight it is given. *Id.* Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.*

"[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph will probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Moreover, it is not for this court to reweigh the various medical opinions in the record. *See Monsour Med. Ctr.*, 806 F.2d at 1190. The court's review is limited to determining if there is substantial evidence to support the ALJ's weighing of those opinions. *Id.* Here, the ALJ's weighing of Dr. Jacobson's and Dr. Bose's opinions is supported by the record, and the ALJ properly assigned no weight to their opinions.

Substantial evidence supports the ALJ's decision to assign no weight to the opinions of Dr. Jacobson and Dr. Bose. The ALJ correctly found that the limitations identified in the form

questionnaires were inconsistent with the limitations described in the treating sources' own treatment notes. Specifically, Dr. Jacobson's treatment notes reflect only mild to moderate tenderness in plaintiff's left flank and abdomen, and slightly diminished strength of 4/5 in her left arm. (D.I. 9-8, Tr. at 311, 321, 340) During this time, Dr. Jacobson's treatment notes also reflect that plaintiff was caring for her ill sister, and was able to lift her to a commode and a gurney. (*Id.* at 310, 339) This evidence contradicts Dr. Jacobson's opinion that plaintiff could lift no more than five pounds. (D.I. 9-9, Tr. at 405) Statements in Dr. Jacobson's treatment notes describing plaintiff's pain as severe or extreme were based on plaintiff's subjective complaints, and not on his examination findings. *See Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996) (noting that a doctor's observation of a plaintiff's complaints of pain does not transform those subjective complaints into clinical evidence, as such a conclusion "would completely vitiate any notion of objective clinical medical evidence.").

Dr. Bose's treatment notes from the relevant time period also conflict with the limitations imposed in his questionnaire, which restricted plaintiff's ability to stand for more than fifteen minutes or lift more than ten pounds occasionally and five pounds frequently. (D.I. 9-9, Tr. at 407) Dr. Bose's treatment notes from December 2011 reveal that plaintiff suffered only mild restrictions in her cervical range of motion, she had moderate tenderness over her cervical spine, and the motor strength of her upper extremities was normal and symmetrical. (D.I. 9-7, Tr. at 295) His examinations revealed no significant restrictions with respect to lifting or walking. (*Id.*)

The ALJ also considered the results of plaintiff's diagnostic MRI and CT scans, which showed cervical degenerative disc disease and some evidence of compression, but did not reveal functional limitations beyond those included in the RFC. (D.I. 9-7, Tr. at 261, 267, 303; D.I. 9-

8, Tr. at 321, 330; D.I. 9-9, Tr. at 399-400)  The court finds that substantial evidence supports the ALJ's decision to assign no weight to the opinions of Dr. Jacobson and Dr. Bose as expressed in the questionnaires, because those opinions are inconsistent with the record as a whole.

Plaintiff's argument that the treating physicians' opinions deserve greater weight is not supported by their records.  The opinions appear on forms requiring no more substantive detail than checking off boxes.  (D.I. 9-9, Tr. at 404-07)  The Third Circuit has explained that form reports which require physicians only to check boxes or fill in a blank are considered "weak evidence at best," especially when such reports are not accompanied by written explanations. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (citations omitted).  "Similarly, pre-printed opinions that do not offer specific limitations, written explanations, or support for assertions may also be considered weak evidence."  *Clark v. Astrue*, 2010 WL 3909161, at *9 (D. Del. June 30, 2010) (citing *Singleton v. Astrue*, 542 F. Supp. 2d 367, 379-80 (D. Del. 2008)).

The only substantive information included in Dr. Jacobson's form is plaintiff's diagnosis of cervical disc disease, left upper extremity radiculopathy, and left upper quadrant adhesions, as well as the nature of plaintiff's pain and plans for future treatment.  (*Id.* at 404-06)  The form completed by Dr. Bose contains even less substantive information, as Dr. Bose merely checked a series of boxes and commented that plaintiff could not work on a regular basis due to her pain. (*Id.* at 407)  The ALJ indicated that the opinions were conclusory and primarily based on plaintiff's subjective complaints.  (D.I. 9-2, Tr. at 38)  The treating sources' apparent reliance on plaintiff's subjective complaints in completing the forms undermines the reliability of their assessments because the ALJ previously determined that plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible in light of the record as a whole.  (*Id.* at 37)

Moreover, the opinions of Dr. Jacobson and Dr. Bose regarding plaintiff's ability to work are not entitled to controlling weight. The Commissioner's regulations explain that medical source opinions that a claimant is "disabled" or "unable to work" are not medical opinions and are not given special significance because opinions as to whether or not a claimant is disabled are reserved for the Commissioner. 20 C.F.R. § 404.1527(d); *see also Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 n.2 (3d Cir. 2008) ("Conclusions of this kind are 'reserved to the Commissioner . . . because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.'"). Thus, the opinions of Dr. Jacobson and Dr. Bose regarding plaintiff's ability to work are "not controlling or even considered medical opinions." *Conn v. Astrue*, 852 F. Supp. 2d 517, 526 (D. Del. 2012).

The ALJ's reliance on the state agency medical consultants' opinions over those of the treating sources was not erroneous because the ALJ explained how the state agency opinions were consistent with the medical records. Plaintiff's allegations that the ALJ improperly relied on those assessments due to the passage of time are not supported by the case authorities. (D.I. 9-2, Tr. at 38) The Third Circuit has specifically noted that, "because state agency review precedes ALJ review, there is always some lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's reliance on it." *Chandler*, 667 F.3d at 361; *Psonak v. Colvin*, 10-959-SLR-SRF, 2013 WL 4718344, at *11 (D. Del. Aug. 30, 2013), *adopted by* 2013 WL 5295194 (D. Del. Sept. 18, 2013). The ALJ in the present case considered plaintiff's subsequently submitted medical records in assessing her RFC, and evaluated plaintiff's complaints of flank pain. (D.I. 9-2, Tr. at 37-38) The ALJ's consideration of the state agency physicians' opinions in addition to other evidence in the record is, therefore, permissible.

### 3.    Sufficiency of the RFC assessment

Plaintiff next claims that the ALJ's RFC assessment was not based on substantial evidence because the ALJ failed to consider the opinions of the treating physicians, records relating to her left flank pain, exam findings, and diagnostic records. (D.I. 13 at 29-30)  In response, the Commissioner alleges that the RFC adequately accounted for all of plaintiff's credibly established limitations, including her pain, her inability to lift heavy objects, her postural limitations, and restrictions on the use of her left upper extremity. (D.I. 18 at 28-30)

For the reasons previously stated at §§ IV.B.1 & 2, the ALJ appropriately rejected the opinions of the treating physicians and discounted the severity of plaintiff's left flank pain in determining which credibly established limitations should be accounted for in the hypothetical and RFC assessment. Specifically, the ALJ indicated that plaintiff's symptoms were well-controlled with pain medication, and treatment records from the relevant time period do not support plaintiff's claim of significant functional limitations which would bolster plaintiff's subjective complaints of pain. The ALJ nevertheless accounted for plaintiff's complaints of pain by limiting Plaintiff to light work. (D.I. 9-2, Tr. at 35)  Plaintiff fails to direct the court to any limitations from left flank complaints, other than pain, which should have been included in the RFC assessment. The ALJ appropriately concluded that plaintiff's complaints of severe pain were not supported by the medical evidence of record and, consequently, the ALJ was not obligated to include additional limitations in the hypothetical and RFC assessment to account for them. *See Rutherford*, 399 F.3d at 554. Therefore, the ALJ's RFC assessment is supported by substantial evidence.

### 4.    Jobs available in the national economy

Finally, plaintiff alleges that the ALJ failed to establish that there is other work in the national economy that she could perform because the hypothetical posed to the VE was deficient

as a matter of law, as it did not account for plaintiff's severe pain. (D.I. 13 at 30-31) Plaintiff's arguments are based on her allegations that the ALJ failed to properly consider the medical evidence, the opinions of the treating physicians, and plaintiff's left flank pain.

For the reasons previously stated, the court concludes that the ALJ properly evaluated plaintiff's RFC, which included plaintiff's credibly established limitations, including pain. The ALJ was not required to adopt limitations inconsistent with and unsupported by the record, such as the opinions of Drs. Jacobson and Bose. *See Christy v. Astrue*, 2012 WL 967869, at * 4 (W.D. Pa. Mar. 21, 2012) ("The ALJ properly rejected any additional limitations as inconsistent with the objective medical evidence of record and supported only by plaintiff's subjective complaints of pain, which the ALJ found to be only partially credible."); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (where there is contradictory evidence, an ALJ may reject the opinion of the treating physician outright, or accord it less weight depending on the extent to which it is supported). As a result, the ALJ's hypothetical was supported by substantial evidence, and the VE's testimony based on that hypothetical was sound. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) (concluding that the ALJ's hypothetical question need only reflect those impairments which are supported by the record). Accordingly, the ALJ properly relied upon the VE's testimony that plaintiff is capable of performing a significant number of jobs in the national economy, such as a reception clerk, bill sorter, routing clerk, inspector, and control worker. (Tr. at 82-83)

## V.    CONCLUSION

For the foregoing reasons, I recommend that the court deny plaintiff's motion for summary judgment (D.I. 12) and grant the Commissioner's cross-motion for summary judgment (D.I. 17).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. Appx. 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: September ___9___, 2016

Sherry R. Fallon
United States Magistrate Judge

27